IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**GLENDOLA FLAKE**                                                                                                      **PLAINTIFF**

V.                                               **CASE NO. 5:24-CV-5048**

**MERCY HOSPITAL NORTHWEST ARKANSAS**                                             **DEFENDANT**

**OPINION AND ORDER**

Now before the Court is Defendant Mercy Hospital Northwest Arkansas's ("Mercy") Motion for Summary Judgment (Doc. 54). The Motion became ripe for review on June 10, 2025, when *pro se* Plaintiff Glendola Flake failed to file a response. Since then, fourteen more days have passed, and Ms. Flake has not contacted the Court in any way to explain the delay or request an extension of time. Even so, the Court is obligated to address the merits of the Motion and may not rule automatically in Mercy's favor. *Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005); *United States v. One Parcel of Real Prop.*, 27 F.3d 327, 329 n.1 (8th Cir. 1994); *Canada v. Union Elec.*, 135 F.3d 1211, 1213 (8th Cir. 1997) ("When a motion would be dispositive of the merits of the cause if granted, courts should normally not treat a failure to respond to the motion as conclusive.").

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Subpart (a) to Rule 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In considering a motion for

1

summary judgment, the Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada*, 135 F.3d at 1212–13.

In the case at bar, Ms. Flake alleges that her former employer, Mercy, fired her unlawfully for reporting a violation of the Emergency Medical Treatment and Labor Act ("EMTALA"). On May 6, 2023, Ms. Flake, a social worker, was asked by hospital staff to help a discharged patient leave the hospital from the entrance area. The patient had already been advised by his attending physician, Dr. Mildred Ehrhart, that he should undergo a limb amputation for necrotic wounds in his leg, but the patient declined. Instead, he asked to be discharged against medical advice. According to Dr. Ehrhart's Declaration, *see* Doc. 55-4, ¶ 4, and as confirmed by her written Discharge Summary, *see* Doc. 55-1, p. 77, she discussed with the patient the risks of leaving the hospital, including worsening infection and death, and recommended that he not leave. She affirms that he understood both the recommended treatment and risks but still wanted to leave. *See* Doc. 55-4, ¶ 5. The patient's signed release appears in the record. *See* Doc. 55-1, p. 79.

When Ms. Flake encountered the patient later that same day, she documented in his chart her impression that he was "alert and oriented as to person, time, and situation." (Doc. 55-2, p. 18). Her progress notes that day describe her unsuccessful efforts to locate a place to transport the patient. *See id.* So, in the end, she brought the patient back to the hospital breezeway, talked to security and another case manager about calling the doctor who treated him, and left for the day. *See* Doc. 55-1, p. 16 (Flake Depo.) A nurse

2

practitioner arranged an Uber to transport the patient from the hospital to a destination of the patient's choosing. *Id.* at pp. 30–31.

The next day, May 7, 2023, Ms. Flake told her supervisors that, in her opinion—and though her May 6 charting notes failed to say so—the patient was confused and lacked the capacity to decline medical treatment. *See id.* Ms. Flake then sought out Dr. Ehrhart, who informed Ms. Flake that the patient had *not* been confused and was, instead, fully capable of making decisions about his medical needs. *Id.* at p. 19.

On May 19, 2023, more than a week after the patient was discharged, hospital administrators convened a meeting with Ms. Flake, at her request, to allow her to voice her concerns about the patient's discharge. In attendance at the meeting were her supervisor, Registered Nurse Rebecca Salvatore; Chief Medical Officer Dr. Sonal Bhakta; Quality Director and Registered Nurse Diana Bravin; Director of Ethics Randy Colton; and Dr. Ehrhart. Immediately after the meeting concluded, Dr. Ehrhart documented that Ms. Flake "progressively raised her voice and overtalked the participants" and "repeatedly stated that she"—*Ms. Flake*—had "assessed the patient for competency and felt he was not competent." (Doc. 55-4, p. 6). Nurse Bravin also reported that Ms. Flake's demeanor at the meeting was "very concerning" because her comments were delivered in a way that was "very confrontational, aggressive, [and] with a threatening tone." (Doc. 54-3, p. 5). However, in Ms. Flake's view, she did not behave aggressively. (Doc. 55-1, p. 53 (Flake Depo.)). In her opinion, "without a doubt," Mercy should have gone to court to have the patient declared incompetent before releasing him. *Id.* at p. 26. .

After the meeting, Ms. Flake was suspended, supposedly due to her aggressive behavior. Human Resources conducted an investigation. After the investigation

3

concluded, Nurse Salvatore emailed Ms. Flake on June 1, 2023, to advise her that her suspension had ended and she could return to work. *See* Doc. 54-2, p. 20. However, there were strings attached: Ms. Flake was required to sign a Corrective Action Form before she could rejoin the team. The Form stated Ms. Flake must agree to "conduct herself in a professional manner displaying Mercy's values of treating people with dignity, respect and charism [sic]" and "not raise her voice, show aggressive behavior or call co-workers names." *Id.* at p. 24.

Ms. Flake and Ms. Salvatore made plans to meet at the hospital on June 7, 2023, at 10:00 AM, to discuss the Corrective Action Form's requirements. Ms. Flake arrived early for the meeting—perhaps even an hour early by her own admission. *See* Doc. 55-3, p. 29 (Flake Depo.). Her security access had been disabled while she was suspended, so Ms. Flake asked a co-worker to let her into the secure area using the co-worker's security badge. *See id.* Though Ms. Flake maintains that she merely went to her desk and sat quietly to wait, Mercy contends that she became confrontational and started yelling at her co-workers. At some point, hospital security officers appeared and escorted Ms. Flake from the building. Later that same day, fourteen of Ms. Flake's co-workers submitted "SAFE"[1] reports to Mercy about Ms. Flake's behavior. *See* Doc. 54-5. All those who submitted SAFE reports described witnessing Ms. Flake raising her voice and behaving unprofessionally on June 7. *See id.* Ms. Flake denies that she was loud, aggressive, or disruptive, though she admits "that's the way [her co-workers] perceived it." (Doc. 55-3, p. 39). Mercy fired Ms. Flake on June 7. *See* Doc. 54-10, p. 20.

---

[1] "SAFE" stands for "Safety, Advocacy, and Feedback for Everyone," and is an online safety software application where Mercy employees can submit both patient and workplace safety concerns to management. *See* Doc. 54-5, p. 2, ¶ 3.

Even when viewing this evidence in the light most favorable to Ms. Flake, it is clear that she did not report an EMTALA violation to anyone. EMTALA imposes two obligations on hospitals—to provide patients with appropriate medical screening and to stabilize patients prior to transfer. *See* 42 U.S.C. § 1395dd(a)–(c). EMTALA does not apply where, as here, a patient "refuses to consent to the examination and treatment" that the hospital recommends. 42 U.S.C. § 1395dd(b)(2).

"[E]very court that has considered EMTALA has disclaimed any notion that it creates a general cause of action for medical malpractice . . . ." *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996). Here, Ms. Flake alleges that Mercy and its medical staff committed malpractice by permitting a patient who refused medical treatment to leave of his own free will. She does not allege that the hospital violated EMTALA by "dumping" the patient at the emergency room door because he was indigent or uninsured. *See Summers*, 91 F.3d at 1136 (explaining that the "purpose of the statute was to address a distinct and rather narrow problem—the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them"). Ms. Flake may have disagreed with Mercy's decision to allow the patient to leave the hospital against medical advice, "[b]ut . . . professional disagreements are beyond EMTALA's reach," *Partin v. Baptist Healthcare Sys., Inc.*, 135 F.4th 549, 560 (7th Cir. 2025), and, in any event, Ms. Flake is not a medical professional.

Because there is no genuine, material dispute that Ms. Flake engaged in protected conduct by reporting an EMTALA violation, her retaliation claim cannot survive summary judgment. The *McDonnell Douglas* burden-shifting analysis applies in the absence of direct evidence to support an EMTALA retaliation claim. *See Elkharwily v. Mayo Holding*

5

*Co.*, 823 F.3d 462, 470 (8th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To satisfy her prima facie burden, Ms. Flake must point to facts to show: (1) she engaged in conduct protected by EMTALA, (2) she suffered an adverse employment action, and (3) there is a causal connection between her protected conduct and the adverse action. *Id.* As she cannot meet the first prong of the test, her claim must be dismissed.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment (Doc. 54) is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**. Judgment will enter separately.

**IT IS SO ORDERED** on this 25th day of June, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

6